The final case of the day. Case number 14, 3997, Local 17 Iron Workers Pension et al. v. Harris Davis Rebar, LLC et al. For argument not to exceed 15 minutes to 5, Ms. Gregel for the appellate. Good morning. I'm Susan Gregel. I'm counsel with Andrew Crampton for the trustees of the Iron Workers Pension et al. That's fine. The trustees of the pension fund are fiduciaries of a defined benefit pension plan that provides lifetime, long-term retirement benefits to individuals who worked as iron workers in Northeast Ohio. There are 2,000 active and retired participants in the pension fund. Contributions are paid by employers, and there's about 125 of them today, who work under contracts, collectively bartered with Iron Workers Local 17, or, as in this case, national companies that have national agreements with the International Iron Workers Association, and those agreements, by reference, incorporate the wages and fringe benefits of the Local 17 collective bargaining agreement. We're here seeking de novo review and reversal of the district court decision to dismiss the complaint to collect $147,000 in delinquent contributions when the district court granted dismissal incorrectly under Rule 12b-6. This pension plan is underfunded. The stream of payments that it owes people who already worked, as well as those that it will owe to people that are still working, exceed the assets of the fund. It's incumbent upon the trustees to collect the contributions for the hours worked by iron workers in Northeast Ohio. Because it's underfunded, this pension plan for a set of trustees adopted a rehabilitation plan under the Pension Protection Act of 2006 to rehabilitate the fund and begin to bring it back into recovery so that— I mean, personally, I think we're all familiar with that kind of agreement. You have the same union agreeing to the—J.D. Steele reaches its agreement with the same union that this Harris Davis reaches its agreement with, right? J.D. Steele had an agreement with the International Association back in 2006. 2012, after J.D. Steele changed his name to what was formerly known as J.D. Steele, Harris Davis reaches a different agreement with the International Association. The same International Association. That's right. And I understand your arguments about withdrawal, liability, and so on. But if the purpose of this is to protect the workers—I mean, this doctrine, alter ego, and we have some language in cases saying that one thing we look at is whether there is harm to the union. Well, if the union signed both contracts, why then would we apply a doctrine that's meant to protect the union? They agreed to the different arrangement. Your Honor, the union and the board of trustees of this pension fund— I know that. I know that. Believe me, I know. I'm totally aware of that. But I don't see a lot of language in these opinions saying the purpose of the doctrine is to protect the fund. I mean, it just so happens that these cases talk in terms of protecting the union's interests. And I query—what I'm driving at here a little bit is, hypothetically, let's say there's a divergence of interest between the union that agreed to these things and the fund. Happens all the time. Okay. So why should the fund prevail for purposes of whether we apply the alter ego doctrine? Because this fund has no knowledge whatsoever, nor any participation in anything that, in this case, the International Association of Washington, but it could be a local union, like in the laborers' pension fund versus RATCO case, where different arrangements are made for the purposes of creating— Well, I'm not talking about a 515 argument, if that's where you're going. Okay? I'm not talking about—I mean, I'm just not—I want this to be more hypothetical or generic at this point. If we have a divergence of interest, if we have the union saying, you know what, we like this agreement, we'd rather have an annuity for our people than a fund that seems to be shaky. They decide that. And so the employers—let's say the union insists on it in the second negotiation. They insist on it. We're not doing it. We're not doing it unless we get an annuity. We don't want to put our eggs in that other basket. So they go along with it. So the union really wants this, but it's bad for the fund because you have fewer participants and you start a spiral, etc. Why should we say that's inequitable? Why should the fund's interest prevail over the union's for purposes of the equity determination in this alter ego doctrine? Because the equity—well, first of all, to do what you just said, that's illegal. The union can't do that under the Pension Protection Act. Assuming it legally, that a union could— I mean, they can choose—you know, we want our people to get an annuity, you know? They can do that. But in any event, go ahead. Because of the restrictions on these underfunded plans, we think it can't be done. Well, let's set that aside. Put it that way. The pension fund has to make good on the promises of all of the other union agreements and all of the members of the pension fund. They sink or swim with what each collective argues. So it is the overall equity. If the hypothetical that you just presented, Judge, would continue, the liability would then attach to, in this case, the other 124 employers. So to look at it simply on this very narrow issue that the union—rightly, wrongly, good-motivated, bad-motivated—allowed and created a contractual defense which doesn't apply on the Section 515 issue, I don't think that allows an employer to do what Harris, Davis, and J.D.— But you know what? If I understand it right, both Harris, Davis, and J.D. Steele are both paid $10 per hour for—I mean, their contribution was the same. It was just one was to a standalone annuity. The other was to the— Again, it's much more different than Ford and Chevrolet. $10 an hour to a defined contribution plan is remarkably different than $10 per hour. But what would you have—if we agreed with your position, would Harris, Davis, then have to pay it the second time? Potentially, yes. There's some case law out of the State of Georgia— That sounds a little unfair, doesn't it? —that recognizes that contributions in this case, even though that there's contractual relationships and defenses created under union contracts, can require an employer— They didn't contribute it to a fund. I mean, here, they contributed it to a contractually agreed arrangement with the union. I mean, have you got a case that says, under those circumstances, that you've got to pay twice? I think ROC Code is that case, that it does require the payment of twice, and I think there's a couple of cement mason's cases where that's been recognized, that the obligation to pay twice carries forward, even though—I mean, it is potentially onerous, because we're looking at 2,000 families, and more than that, they have their 125 employers and their employees. I'm curious. Just yesterday, I assume we all got the letter about the supplemental authority about this—what is it called?—Patry Construction Company. What's your response to why that case isn't controlled? That was a decision of our court just three months ago, saying there was no double-breasted kind of liability. Well, the lawyer in the trial court did not, at any time, challenge the sufficiency of our allegations about the alter ego status of Harris Davis and formerly known as J.D. Steele. We alleged all of the factors which this court considers under Fullerton and industrial contracting. So, in looking at docket number six and docket number nine, which was the briefing in the trial court, those issues about whether—I mean, we can't— Now, so assuming, though, on de novo review, the court is going to consider that— We can. We can affirm on it. We've alleged the alter ego status, and then we would urge the court to apply industrial contracting, recognizing that it's a flexible doctrine, that employers in this era where there are many variations of business structures will, to get away of the significant tail of withdrawal liability to DB plans, create new structures to do that, that this court should not follow and cut off on a 12B6 under the facts of this case our ability to go forward. This clearly is a case where the purpose is shown. They wanted to escape the long-term liability. Is it alleged in the complaint? That's one thing that I wasn't so sure about in your—about your argument. Well, what we alleged in the complaint was common management, common purpose, common customers, and that they built a parking garage at Fairview General Hospital under the name of J.D. Steele, and then 10 miles away built a parking garage for University Hospitals under the name of Harris Steele using the same supervision. Are you claiming they've done this for many, many projects, or only this one—or the two garages? The new contract was made in 2012. These projects with 14,700 man-hours was significant, done in early 2013. This is the first time it was done in the area covered by this pension fund. But Patrick seems to say, hey, one comparison of a common job isn't enough. Well, Patrick was a situation where I think it was a series of smaller jobs. This was a major job. It was all of the work done in this area, all of the work done by J.D. Steele on the Fairview job and all of the work. So from our standpoint, it was 100 percent of the work, not a few jobs here or there, Judge. But your complaint—well, I don't mean to end that line. That's okay, no. Your complaint just doesn't say anything about this withdrawal liability. I mean, and I understand where you're coming from about why it seems like that's why they did it. But, you know, I mean, you make the allegations about alter ego, but you don't address withdrawal liability. That's just not part of the plea. It certainly can be derived from what's said in the complaint. What you have in front of you are two collective bargaining agreements with the International Association and Harris-Davis, and it provides in there that if there would be contributions required to a D.D. plan under the Harris-Davis agreement, then the agreement's null and void. The actual imposition of withdrawal liability on either of these companies hasn't matured yet because they both remain parties to the International Association. For that reason, the specific allegations of an intent to evade haven't ripened yet. Okay. But the purpose of it, that there is an underlying reason to pay $10 an hour to a defined contribution plan as opposed to a D.D. plan—I understand. Thank you. Your initial time has expired, but you'll have your full rebuttal. It goes fast. Thank you, please. My name is Lee Hutton, and I'm here on behalf of J.D. Steele and Harris-Davis, which I refer to as HDR. Put simply, this record got right. This case is a close call for application of the alter ego doctrine, especially given what was pleaded in the complaint and not pleaded in the complaint. The alter ego doctrine is a judicially created equitable doctrine to prevent sham transactions where companies alter their corporate form to evade legal obligations. So, for example, to evade a federal statutory obligation. Every test that I've read of alter ego talks in terms of sham corporate transactions to avoid labor obligations by altering the corporate form. I'm sorry. No, that's okay. Go ahead. In surveying all of the Sixth Circuit cases that I have read on the topic, at least in terms of the labor, keep in mind alter ego is a doctrine that's applied commercially. You're a lot more familiar with it than I am in that setting. But in the labor and employment context, where you have this relaxed burden, in every single case you've been looking at the labor obligations, which are either going to be under a contract or sometimes it's an employer trying to get rid of you or shut for a better one, there is not a Sixth Circuit case that I'm aware of that involves facts, anything like this. Well, I mean, that doesn't mean it doesn't apply. I mean, I will say this to you. The test is the test. And the test is not whether a particular scenario is this double-breasted business or this disguised continuation business. That's not the test. The test isn't one of those two. The test is a bunch of different factors, ownership, share of this and that, et cetera, which determines at least the initial determination of, are these alter egos? I mean, isn't that fair? Yes and no. Just because this isn't a double-breasted thing doesn't mean it can't be. That test that your honor is, and we'll talk about, didn't just drop out of thin air. It arose in a factional context. It arose in the context of no accident. And the Sixth Circuit, the test is just not, I'm just telling you my own point of view, the argument that it can only apply in those two things, I don't see that in the case law. It happens to be that most of the time it is those two things, but the test is not in those terms. And just speaking for myself, I'm highly skeptical of the idea that it can only be in those two things per the test. And I'm actually not arguing that. Okay. I thought you did in your brief. At length. I did, but the Resilient case, which Judge Gilman is familiar with, happened to be different facts, and the test was applied to differently there. What disguised continuance cases and double-breasted cases have in common, is we're starting out with a flashpoint of some facts of, this is an employer that's something with a corporate form to get rid of the union or to duck out of the contract. That raises an eyebrow. And because, as this court has said, intent is hard to prove, we're not going to require that you prove intent. It's relevant, but we're not going to require that you approve it. We're instead going to look to, and the court talks in terms of a relaxed standard in those settings. The relaxed standard isn't appropriate here, and here's why. It actually springs from a question that you hit, to a felon's argument. This becomes an unprecedented expansion of the Alter Ego Doctrine because, as we both know, the same union, international union, negotiated both of these contracts with both employers. Okay? It was negotiated by a sophisticated international union, and there's no allegation in the complaint. You can look high and low that either J.P. Steele or H.D.R. tricked, deceived, or in any way pulled the wool over the eyes of the international. Why is it important that the is built upon a foundation of, it's the union who has a duty and a responsibility to represent the members and negotiate these contracts, not a pension fund. We put it on the shoulders of the union to make those judgments, and there's no worthy who's not here, who has not filed any alter ego claims, if not the international union who agreed to those deals, and probably remembered that Jeff Green, six years earlier, signed an agreement for J.D. Steele, and happened to be running Harris Davis, another national company, publicly owned, six years later. That the international's not here, the local union is not here, not a single man or woman who worked on those jobs is here, that all of those individuals or people or institutions receives a full benefit of their bargains, or in the case of the workers, their labor. Not one of them, of the interested parties here, has suggested that either of these companies did anything to get out of their labor obligations, because they got everything that they bargained for. They're still around. That's why it's key. Can I ask you this question? Are you aware of any cases where the alter ego doctrine has been applied not to vindicate an interest protected by labor law, in the sense of like union, NLRB interest? In the ERISA cases, because a lot of them cited by both parties. Maybe it overlaps. Yeah, overlap. Okay. What I will say is that I am aware, and I defer to my counsel because I'm more of a labor lawyer than an ERISA lawyer, that in the whole withdrawal liability area, there are different statutes, I've got them in my notes someplace, I could find it, that talk about the test for withdrawal liability of when you look at one company or two, and it's referred to as a common control test. There's no allegation in the complaint. I'm just going to call him J.D. Steele, if you don't mind. There's no allegation in the complaint that J.D. Steele has stopped the only allegations in the complaint are that it, at all relevant times, continues to do business in Northeast Ohio, and that at the only period of time that anything was going on here, both of them were operating at once. What about your theory on the Pension Protection Act portion of the appellant's claim? Does the PPA apply here to require Harris Davis to contribute? I actually was going to skip that one, but I will tell you that the Pension Protection Act does not, the Pension Protection Act creates lots of obligations for employees who are already obligated to contribute to a fund. It does that. To employers. To employers. Did I say employees? Excuse me. It creates no obligations for, or doesn't create an obligation to contribute, and if there's one thing that's clear, HDR's agreement made it clear that they didn't have an obligation to contribute, never did, couldn't have written it more ways than Sunday in that agreement, and as I think Judge Nugent properly found, simply pegging or tying what you're going to pay in terms of a contribution rate to what's in a collective bargaining agreement isn't obligating yourself to pay into a multi-employer pension fund, hence it's not illegal. The problem there is that, I mean, that is a statutory requirement. If you're obligated to make contributions to a pension fund, then you have some other obligations under this Pension Protection Act, and the plaintiffs say that some of those obligations require this other HD or whatever they are to make the contributions, but we can't, but if this Harris Davis is in fact an alter ego of J.D. Steele, then we have to treat Harris Davis as being J.D. Steele. Agreed. If Harris Davis is an alter ego, then there would be no difference, but it's not. I mean, this is kind of a strange situation because the district court did not reach the question whether under the alter ego test, Harris Davis is an alter ego of J.D. Steele. The district courts instead said, regardless of how that would shake out, there are three categorical reasons why they can't be alter egos. Reasons that don't have to do with the application of the test itself. You know, they're not going to a non-union shop, etc. You know, the things we've already talked about. So those are like exceptions to the general rule of alter ego. Maybe I'm not making much sense, but if the regular alter ego factors would lead to a finding that they're alter egos, why shouldn't we just apply those factors with respect to the PPA, as opposed to judge made exceptions to the alter ego test? And the only reason I'm looking at what Judge Nugent read, and you know, in essence, what he said is even assuming the facts alleged in the complaint, separate union shops pursuing the labor agreements that met their obligations, including identical contributions, the only difference is the fund that they contribute to. And hence, so this really ties right back to the alter ego test, there is no weightiness of the possibility of withdrawal liability, having avoided any labor obligations. So I actually disagree with the thought that the trial court stepped around it. I'm out of time. Can I say a couple of words on the whole issue of what the complaint says? You may, and your green light's still on, actually. Oh, okay. I saw a red light. Hence, it will be more than a couple of words. You shouldn't have told him. I know. I kept my mouth shut. You did that time, I have to give you credit. Even if, and by the way, the test that your honor was talking about is called the relaxed standard for a reason, but even if the relaxed standard applied here, and we would say it shouldn't for the reasons I just mentioned, it doesn't fit. There are not enough facts in this What is that standard? Whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision, and ownership. I would challenge this court to look at any of the cases of both of the cycles, and you can ask whether there are four cases or six circuit cases or other circuits, and there's a lot of evidence on those cases, or on those facts, in all the cases where they've been found. But this is a 12B6 case, so they don't need evidence. So is the allegations. Okay. What allegations are lacking here, do you think? Starting with this, there is no specific allegation of identical management, except for the foreman and supervisor, which is just like the patrons case. Which is just like which case? The patrons case, the one that I wrote the letter on yesterday. Okay, I seem to have missed that. Yeah, okay. No specific allegation that they share a common customer. UH is one company's customer, the other company's customer was Fairview Hospital. No specific allegation concerning ownership. How core is that? No specific allegation on management, except for on those two jobs, the foreman and supervisors were the same. And no specific allegation of intertwined financial affairs. And if you read all these cases, that's what gets alleged, that's what's there. None of this is here. What's your best case for the proposition that this is not a sufficient allegation to meet this test? The case of water. Okay. Because it's a 12B6 case and it is really, really close. And I won't read the quote because now I'm in my sum up time. What I will only add is that the only difference that I can think of between patrons, and by the way, if you look at the side-by-side comparison of what they pled in patrons, which didn't even get pled here, this is weaker than patrons. But the only difference between them that I can see is that there the trial court gave the leave to amend and they went back out of the second crack. Here, the pension fund didn't even ask for leave to amend. So it's not like at any point they ever said to the court, give me a chance and I'll say more. Thank you, Mr. Hutton. I appreciate your argument. Ms. Griegel. The issue about the pleading of the alter ego facts and one request for leave to amend was not made because those issues, the sufficiency of allegations about substantially identical management, which do appear in the complaint, but the word sufficiently specific was never made in the trial court. It just doesn't matter because we can affirm on any basis supported by the record. So, I mean, which, I mean, Mr. Hutton, if I'm sorry, Mr. Hutton said you didn't allege shared customer. Is that true in your view? The type of business was the same, but there was, whether they were working for the same general contract or not. Okay. Um, uh, there's no allegation of shared ownership is, I mean, that is that paragraph 35 at all time J.D. Steele and Davis Rebar shared substantial identical ownership. Okay. That's a good answer. Um, how about the same chief operating control? Well, I mean, but this is really just a, that is itself kind of just a conclusory recitation of the test itself. I mean, that's not good enough, right? Um, the issue and the reason I started down this path judgments, if in fact the court believes that more meat needs to be attached to those allegations, even though it's at 12 v six, I see, I see where you're going with prejudice of this. We would ask for me to be remanded. I understand. Okay. Um, going back to the, um, issue of the pleadings in paragraph 34 of the complaint, there is a specific allegation of, um, the purpose with wave axle of potential withdrawal. Oh yeah. Okay. Thank you. Earlier, now on that, that point I wanted to ask you, it seems a little premature to be talking about evasion of withdrawal liability when there is no allegation. And apparently it is not true. It would that J. D. Steel has ceased operations and is no longer participating in the fund, right? I mean, isn't this more, it would seem like your argument is less. They're trying to evade withdrawal liability than it is that they're just reducing the number of participants, which is harmful to sort of finances. Had this case gone to the next phase of the district court, there would also be evidence that it can reduce the number of contributions. Now down the road, it's a smaller withdrawal liability. So we don't believe under industrial contracting that it is necessary on these facts to demonstrate an intent to evade. But as an additional indication of that, the fact that there is a scheme here to limit the potential closure withdrawal liability is part of the aspects of the case that we've brought forward. Um, and then I would note, um, under the bank, central states case versus banking case on this court, um, even if the union does agree with the employer, you don't have to contribute. That does not affect the outcome of an obligation to pay contributions when there's otherwise an obligation to do that because of the application of alter ego. So for that, what was the name of that case again? It is, um, central states, uh, versus banky. Everything is central states versus something or Detroit carpenters. Okay. Um, 883 F second. I had a central states case. So, you know, thank you. Okay. Thank you. Uh, uh, Council for your arguments. This will be submitted. Um, that completes our docket for the morning. Uh, you may adjourn.